IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| BUILDER SERVICES GROUP, INC. <br><br> **Plaintiff** <br><br> v. <br><br> **LONNIE DILLON** <br> Serve at: <br> 119 W. North St. <br> Eldon, MO 65026 <br><br> **LAKE RESIDENTIAL COMMERCIAL INSULATION, LLC** <br> Serve at: <br> Cogency Global, Inc. <br> 406 N. Main St., Suite B <br> Rolla, MO 65804 <br><br> **GOLEY INSULATION, INC.** <br> Serve at: <br> SCW Registered Agent, Inc. <br> 903 S Lindbergh Blvd, Ste 200 <br> Saint Louis, MO 63131-2934 <br><br> **Defendants.** | Case No. <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Builder Services Group, Inc. ("BSG"), and for its Complaint against Defendants Lonnie Dillon ("Dillon"), Lake Residential Commercial Insulation, LLC ("LRC"), and Goley Inc., dba Goley Insulation ("Goley") (collectively "Defendants") states:

## JURISDICTION AND VENUE

1. BSG is a for-profit corporation organized and existing under the laws of the state of Florida and licensed to do business in Missouri. BSG maintains its principal place of business at 475 North Williamson Blvd., Daytona Beach, FL 32114.

2. Dillon is a citizen of Missouri and resides in Miller County, Missouri.

3. LRC is a for-profit corporation organized and existing under the laws of the state of Illinois and maintains its principal place of business at 1707 Bluffview Drive, Dupo, IL 62239-1488, rendering it a citizen of Illinois.

4. LRC is licensed to do business in Missouri. Its registered agent is Cogency Global, Inc. 406 N. Main St., Suite B, Rolla, MO 65804.

5. LRC conducts continuous and systematic business within the State of Missouri and that activity gives rise to this suit.

6. Goley is a for-profit corporation organized and existing under the laws of the state of Illinois and maintains its principal place of business at 1707 Bluffview Drive, Dupo, IL 62239-1488, rendering it a citizen of Illinois.

7. Goley is licensed to do business in Missouri. Its registered agent is SCW Registered Agent, Inc., at 903 S Lindbergh Blvd, Ste 200, St. Louis, MO 63131-2934.

8. Goley conducts continuous and systematic business within the State of Missouri and that activity gives rise to this suit.

9. This Court has jurisdiction under 28 U.S.C. § 1331 because there is a federal claim (Defend Trade Secrets Act, 18. U.S.C. § 1836) and this Court also has jurisdiction in accordance with 28 U.S.C. § 1332, because there is complete diversity, as BSG is a citizen of Florida and Defendants are citizens of Missouri and Illinois, and the amount in controversy exceeds $75,000.

10. The value of the irreparable harm that will occur without injunctive relief exceeds $75,000. In addition, BSG is seeking damages in excess of $75,000. BSG is also seeking statutory and contractual attorneys' fees, which BSG reasonably believes will be in excess of $75,000.

11. This Court may properly maintain personal jurisdiction over LRC and Goley because their contacts with this state and this judicial district are sufficient for the exercise of

jurisdiction to comply with the traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny, including having committed tortious acts in Missouri.

12. Venue is proper in this Court pursuant to § 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to BSG's claims occurred within this jurisdiction.

## FACTS COMMON TO ALL COUNTS

### A. BSG's Business

13. BSG is a leading installer and specialty distributor of insulation and building material products to the North American construction industry for both residential and commercial jobs.

14. BSG's business and success depends upon the customer contacts, goodwill, and relationships developed by BSG and its employees, the repeat business of BSG's customers, and the continued confidentiality and ownership of its and its affiliates' proprietary information and trade secrets.

15. BSG's business is highly competitive and, for this reason, BSG has invested substantial time, money, and effort developing and maintaining relationships with its customers, developing its sales processes, sales and marketing strategies, pricing and cost strategies, profit margins and operations.

16. In connection with its growing business and to maintain its competitive edge in the industry, BSG has acquired businesses in smaller markets.

17. On April 17, 2024, BSG entered into an Asset Purchase Agreement with Nate's Insulation, LLC, NaCo Investments LLC, and Nathanial Scrivener to purchase all or substantially

3

all of assets. These purchased assets include, among other things, accounts receivable, tangible assets and inventory, marketing materials, customer lists, contracts, business names and other intellectual property, including trade secrets and confidential information relating to the business operating under the name "Nate's Insulation" or "GreenSpace Insulation." (hereinafter, "GreenSpace"). Exhibit 1, Asset Purchase Agreement (financial information redacted).

### B. BSG's Confidential Information and Trade Secrets and Other Legitimate Business Interests

18. In connection with its business, BSG has developed and/or acquired and maintained certain business information, including, but not limited to, customer lists and documents containing customer identity information; information on pricing, margins, and sales to its customers; marketing information; sales data; financial information concerning BSG and its customers; and personnel information concerning BSG's employees (the "Confidential Information and Trade Secrets").

19. BSG's Confidential Information and Trade Secrets includes information acquired as part of the asset purchase of GreenSpace.

20. The Confidential Information and Trade Secrets gives BSG a competitive advantage not enjoyed by other persons not in possession of the Confidential Information and Trade Secrets.

21. The Confidential Information and Trade Secrets is not generally known to, or readily ascertainable through proper means by individuals outside BSG.

22. BSG has invested substantial time, effort, and expense in establishing and developing the Confidential Information and Trade Secrets, and in developing valuable and extensive trade, business, trade name, and goodwill among its customers and in developing contacts and business relationships with its customers and employees.

4

Case 2:24-cv-04092-BP   Document 1   Filed 06/06/24   Page 4 of 18

23. BSG used, and continues to use, reasonable and diligent efforts to maintain and protect the Confidential Information and Trade Secrets, including the use of non-disclosure, non-competition and non-solicitation agreements, password protected computer systems, and confidentiality policies limiting access of Confidential Information and Trade Secrets.

24. The Company requires employees to sign a Confidentiality, Intellectual Property Assignment, Non-Compete and Non-Solicitation Agreement ("Agreement"), pursuant to which they agree not to, among other things, work in the same or similar capacity for a competitor within a 100 mile radius from each location of the Company or its affiliates at which Employee provided services or any district, region, or geographic territory assigned to Employee or in which Employee otherwise worked at any time during the period preceding the Employee's termination of employment, service or solicit the Company's customers or solicit the Company's employees. Specifically, the Agreement provides as follows:

> 5. <u>Need for Covenants</u>.  Employee understands that the Company and its Affiliates have spent and will continue to spend substantial amounts of time, money and effort to develop their business, Confidential Information, reputation, goodwill (both associated with their respective trade names and geographic areas of business), and their customer, supplier and employee relationships. Employee further understands that Employee will benefit from those investments and efforts. Employee acknowledges that Employee's use of any such matters to compete against the Company or its Affiliates in an unrestricted manner would be unfair and detrimental to the Company and its Affiliates. Employee agrees that taking advantage of any of the above-identified investments of time, money or effort expended by the Company and its Affiliates would unfairly place the Employee at a competitive advantage over the Company and its Affiliates. Employee further acknowledges the Company's and its Affiliates' need to protect their business interests by reasonably restricting Employee's ability to compete with them. Finally, Employee acknowledges that the Company would not employ, or continue to employ, Employee without Employee's agreement to be bound by the provisions of this Agreement.
>
> 6. <u>Definitions</u>.
>
>    (a) "Affiliate" means, as to any person or entity, any other person or entity (i) that directly or indirectly controls, is controlled by, or is under direct or

5

Case 2:24-cv-04092-BP   Document 1   Filed 06/06/24   Page 5 of 18

indirect common control with, such person or entity or (ii) that has the power directly or indirectly to direct or cause the direction of the management and policies of such person or entity, through the ownership of voting securities, by contract or otherwise.

(b) "Competitive Capacity" means performing the same or similar duties as those performed by Employee on behalf of the Company at any time during the twenty-four (24) month period preceding the date of Employee's termination of employment.

(c) "Competitive Products" means any product or service offered by the Company or its Affiliates in the Territory or any product or service that directly or indirectly competes with or is substantially similar to such product or service. For illustrative purposes, these products may include insulation products, fireplaces, gutters, garage doors, and closet shelving.

(d) "Competitor" means any person or entity (including Employee or an entity that Employee becomes affiliated with or renders services to) that offers, or is actively planning to offer, Competitive Product within the Territory.

(e) "Customer" means all customers and actively sought prospective customers of the Company and/or any of its Affiliates with whom Employee had contact in the performance of Employee's duties at any time during the twenty-four (24) month period preceding the date of Employee's termination of employment.

(f) "Territory" means the area comprising a one hundred (100) mile radius from each location of the Company or its Affiliates at which Employee provided services or any district, region, or geographic territory assigned to Employee or in which Employee otherwise worked at any time during the twenty-four (24) month period preceding the date of Employee's termination of employment.

(g) "Restricted Period" means the period of Employee's employment with the Company or an Affiliate and for a period of twelve (12) months following date of Employee's termination of employment for any reason, whether voluntary or involuntary.

(h) "Directly or indirectly" means conduct taken individually, through other individuals, or as a partner, shareholder, member, officer, director, manager, employee, salesperson, independent contractor, agent, or consultant for any other individual or entity.

7. <u>Non-Solicitation/Non-Interference</u>. During the Restricted Period, Employee shall not, either for Employee's own account or for or on behalf of any Competitor, directly or indirectly, take any of the following actions:

(a) Contact or otherwise solicit any employee, consultant, or independent contractor of the Company with the intention of encouraging such person to terminate his or her employment or other relationship with the Company or any of its Affiliates, or employ or otherwise hire or engage any such person;

(b) Solicit, call upon, accept work and/or orders for product from, or initiate communication or contact with any Customer for the purpose of offering Competitive Products to such Customer, or otherwise offer Competitive Products to such Customer;

(c) Solicit, call upon or initiate communication or contact with any Customer, vendor or supplier of the Company or any of its Affiliates for the purpose of encouraging such person to terminate, place elsewhere or reduce the volume of its business with the Company or its Affiliates; or

(d) Otherwise attempt to directly or indirectly interfere with the Company's or any of its Affiliates business or its relationship with its employees, independent contractors, vendors, suppliers or Customers.

8. <u>Non-Competition</u>. During the Restricted Period, Employee shall not, either for Employee's own account or for or on behalf of any Competitor, directly or indirectly, take any of the following actions:

(a) (i) Have an ownership or financial interest in a Competitor, (ii) advise or consult with a Competitor concerning competitive activity in the Territory, or (iii) otherwise be employed by or provide services in a Competitive Capacity to a Competitor in the Territory;

(b) Engage in the production, sale or distribution of Competitive Products in the Territory; or

(c) Market, sell, or otherwise offer or provide Competitive Products in the Territory.

25. The Agreement provides for the recovery of costs and attorneys' fees.

26. The Employee Agreement provides that it is governed by the laws of the State of Florida.

### C. Dillon's Employment with and Separation from BSG

27. Upon execution of the Asset Purchase Agreement, BSG became the sole owner of Greenspace's trade secrets and confidential information, as well as all other assets including its phone numbers.

28. Dillon was employed by the business operating as Greenspace from August 31, 2018 until his abrupt resignation on May 21, 2024. Dillion was effectively solely responsible for scheduling jobs and had personal relationships with 75% or more of GreenSpace customers. Dillon made statements to the effect that he was responsible for several million dollars in sales revenue. Dillon was intimately familiar with all aspects of GreenSpace business, including customer preferences, pricing strategies, marketing strategies, supplier information and preferences, and employee compensation and other personnel information.

29. Despite having no ownership in GreenSpace, Dillon held himself out at times to the public as an "owner" of GreenSpace Insulation (including having a business card identifying him as an "owner.")

30. On April 19, 2024, BSG offered "continued employment" to Dillon in the position of Branch Manager. As a condition of employment, the Offer of Employment required Dillon to sign BSG's Confidentiality and Non-Competition Agreement.

31. Dillon met with Brian Betters ("Betters"), the Director of Operational Development on April 19, 2024 at BSG's office in Eldon, Missouri.

32. At this April 19, 2024 meeting, Betters discussed with Dillon BSG's offer of "continued employment" and provided Dillon a written document memorializing the terms, including Dillon's compensation.

33. As stated in the Offer of Employment document, as a condition of his employment with BSG, Dillon was "required to read, sign and return a Confidentiality and Non-Competition Agreement along with the signed offer letter."

34. Dillon negotiated with Betters regarding his compensation, which was notated on the Offer of Employment document.

35. In Betters's presence, Dillon signed the Offer of Employment, dated April 19, 2024.

36. At this April 19, 2024 meeting, Betters also discussed with Dillon BSG's Integration Bonus Opportunity and provided Dillon a written document memorializing the terms.

37. As stated in the Integration Bonus Opportunity document, as a condition of his participation in the Integration Bonus Opportunity, Dillon was required to "execute[ ] the Company's standard protective covenant agreement[.]"

38. Dillon negotiated with Betters regarding when installments of the integration bonus, if earned, would be paid to Dillon, which was notated on the Integration Bonus Opportunity document.

39. In Betters's presence, Dillon signed the Integration Bonus Opportunity document, dated April 19, 2024.

40. In Betters's presence, Dillon signed the Agreement, dated April 19, 2024. *See* Exhibit 2, Confidentiality and Non-Competition Agreement.

41. At the time Dillon signed the Agreement, Offer of Employment, and Integration Bonus Opportunity, he was employed as a Division/Branch Manager at the Eldon, Missouri branch that served customers in Eldon, Kansas City, and surrounding areas.

42. As he has specifically negotiated and reflected in the Offer of Employment that Dillon signed, Dillon's annual compensation as Branch Manager was over $103,500, in addition to benefits.

43. In this position, and in reliance on the terms of the Agreement, Dillon was allowed to continue having access to BSG customers and knowledge of BSG's Confidential Information and Trade Secrets (which, in part, included information purchased and obtained under the April 17, 2024 asset purchase).

44. On May 11, 2024, Dillon received an email to his BSG email from Kristin Bochetti, from Goley, stating: "Good morning, Lonnie. I sent a text the other day and wanted to follow up with an email. I'm with Goley Insulation, based near St. Louis. We have an interest in your market, and with the recent acquisition, were wondering if you'd be willing to have a call with our owner – DeWayne Goley. We've been in business for over 50 years and have plenty of material for our jobs. Now, we need to put a strong team in place. I appreciate your consideration and look forward to speaking with you."

45. On May 21, 2024, Dillon voluntarily resigned from BSG giving "no notice." When asked about his plans, Dillon misled BSG representatives, saying that he was going to work for a "buddy who did construction."

46. When Dillon separated from BSG, he maintained his sole access to one or more phone numbers used by BSG (and which were displayed on company trucks as advertising) thereby preventing BSG from receiving phone calls from its customers or generating new business.

47. On or about May 23, 2024, Dillon accepted employment with LRC or Goley, related companies that both directly compete with BSG. The exact relationship between LRC and

Goley is unclear, but they have the same business addresses and DeWayne Foley has represented himself as the owner of LRC.

48. Since accepting employment with LRC or Goley, Dillon has accepted phone calls from BSG customers, potential customers, employees, or other business-related contacts from phone numbers 573-434-3588 and 816-760-2854 (which are publicly associated with BSG but ring on Dillon's phone) to engage in breaches of the Agreement.

49. Dillon has misappropriated these customers, potential customers and other business related contacts for his own financial gain and that of his new employer.

50. Dillon, individually and as an agent of LRC or Goley, scheduled – but failed to fulfill – appointments with customers on behalf of BSG, thereby harming BSG's goodwill and reputation with its customers when BSG did not attend the appointments (of which they had no notice).

### C. Employee's Breach of Agreement

51. Like BSG, LRC/Goley specializes in installing insulation products for both residential and commercial buildings, and is thus a direct competitor of BSG.

52. LRC and Goley are located at 1707 Bluffview Dr., Dupo, IL 62239, but provide installation services in and around the Eldon, Missouri area, where Dillon worked while employed with BSG. Although a competitor to BSG, LRC/Goley did not previously have offices or physical operations in or around Miller County prior to employing Dillon.

53. The area in which Dillon works now as an employee of LRC/Goley is within 100 miles of where Dillon worked as an employee of BSG. Most recently on June 6, 2024, Dillon was seen by an employee of BSG working at 720 East 5th Street in Eldon, MO with at least three other

former BSG employees which Dillon solicited and Goley/LRC hired in breach and interference of the Agreement.

54. Upon information and belief, Dillon solicited or encouraged these three former BSG employees to terminate their employment with BSG and join Dillon at LRC/Goley: Trenton Dillon, McKinley Keeney, and Kadon Dillon.

55. On May 29, 2024, the Company sent a Request to Immediately Cease and Desist Illegal Activities, reminding Dillon of the existence of the Agreement and putting LRC/Goley on notice that the Agreement contained certain post-termination obligations of Dillon. *See* Exhibit 3, true and correct copies of the letter.

56. Dillon not only refused to comply with his contractual obligations, he refused to return BSG's confidential information and trade secrets and refused to assist in redirecting BSG customer calls coming to his personal phone from a phone number associated with BSG.

57. Upon information and belief, Dillon is continuing to solicit BSG employees, customers and prospective customers to move their business to LRC/Goley with the assistance of LRC/Goley and using BSG's confidential information and trade secrets including but not limited to customer information, employee personnel information, pricing information, and marketing information. Since Dillon resigned, nine BSG employees who had not previously indicated a desire to end employment with BSG have thereafter resigned or tendered resignation notices (including, but not limited to, Trenton Dillon, MacKinley Keeney, and Kadon Dillon). Based on Dillon having gone to work for a competitor and having misrepresented his plans, it is reasonable to believe that Dillion has violated the Agreement by encouraging these employees to terminate employment with BSG

58. Upon information and belief, the Defendants have used and continue to use BSG's confidential information and trade secrets to gain an unfair competitive advantage in the marketplace.

59. Upon information and belief, Dillon is continuing to breach his restrictive covenants to advance his own pecuniary interests and those of LRC/Goley.

60. As a result of Defendants' actions, BSG has suffered and will continue to suffer irreparable harm and economic damages.

## COUNT I – BREACH OF CONTRACT

*Against Defendant Dillon*

61. BSG realleges and incorporates as if fully restated herein paragraphs 1 through 60 of its Petition.

62. Dillon's Agreement with BSG is a valid and enforceable contract under Florida law and Florida Statute § 542.335.

63. Dillon agreed to abide by the terms of the Agreement, including the non-competition and non-solicitation covenants contained therein.

64. The Agreement, including the non-competition and non-solicitation covenants, constitute valid, enforceable contracts supported by adequate consideration.

65. The non-competition and non-solicitation covenants are reasonable and no greater than fairly required to protect and preserve BSG's legitimate protectable interests, particularly its goodwill among clients and its relationships and contacts with its clients, and its Confidential Information and Trade Secrets.

66. BSG has fulfilled all of its obligations under the Agreement and all other conditions precedent to the operation of the Agreement have occurred or taken place.

67. Dillon breached the Agreement by going to work for a direct competitor of BSG, LRC/Goley, in the same or similar capacity at a location within 100 miles of his work location with for BSG.

68. Dillon further breached the agreement by directly and indirectly soliciting BSG employees to leave BSG to join LRC/Goley.

69. Since Dillon resigned, nine BSG employees who had not previously indicated a desire to end employment with BSG have thereafter resigned or tendered resignation notices (including but not limited to Trenton Dillon, MacKinley Keeney, and Kadon Dillon). Based on Dillon having gone to work for a competitor and having misrepresented his plans, it is reasonable to believe that Dillion has violated the Agreement by encouraging these employees to terminate employment with BSG.

70. Dillon also breached the Agreement by misappropriating BSG's confidential information and trade secrets, including customer and prospective customer information, and by diverting BSG customers and business to LRC/Goley.

71. The conduct of Dillon, described herein has caused and/or threatens to cause BSG's clients to cease doing business with BSG as well as BSG's employees to cease employment with BSG, and/or has reduced the volume of business clients are doing with BSG and/or has caused and/or threatened to cause a loss of goodwill, thereby damaging BSG.

72. As a direct and proximate result of Dillon's breach, BSG has suffered and will continue to suffer damages, including but not limited to, lost profits and a loss of goodwill. The continued loss of business as a result of these violations of the Agreement could lead to a substantial decrease in the volume of BSG's business/profits, well in excess of $75,000.

73. Under the Agreement, Dillon agreed to pay BSG's attorneys' fees in connection with the enforcement thereof. BSG has incurred such fees and will continue to incur such fees.

74. As a direct and proximate result of Dillon's breach of the Agreement, BSG has suffered, and will continue to suffer, irreparable harm and economic damages.

## COUNT II – TORTIOUS INTERFERENCE

*Against Defendants LRC/Goley*

75. BSG realleges and incorporates as if fully restated herein paragraphs 1 through 74 of its Complaint.

76. LRC/Goley knew of the Agreement and the restrictions imposed on Dillon.

77. LRC/Goley's employment of Dillon has induced or caused Dillon to breach the Agreement, interfering with BSG's contractual expectations.

78. LRC/Goley has no justification for such interference.

79. LRC/Goley's conduct has caused damage to BSG stemming from Dillon's breaches of the Agreement.

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS
### Defend Trade Secrets Act, 18. U.S.C. § 1836
**(Against all Defendants)**

80. BSG realleges and incorporates as if fully restated herein paragraphs 1 through 80 of its Complaint.

81. While working for GreenSpace and BSG, Dillon had access to confidential information and trade secrets including, but not limited to, client lists, client records, client contact information, account information, pricing information, marketing strategies, and employee personnel information.

82. GreenSpace and BSG expended substantial time, effort, money and resources in developing and maintain its confidential information and trade secrets.

83. Dillon was allowed access to this information as part of his employment with GreenSpace, and then BSG, and was paid to develop customers and business for the benefit of his employer.

84. GreenSpace and BSG expended substantial time, effort, money and resources in developing and maintaining its confidential information and takes reasonable, affirmative measures to maintain the confidentiality of this information.

85. This confidential information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

86. This confidential information constitute trade secrets subject to protection under the Defend Trade Secrets Act, 18 U.S.C. §1832.

87. By signing BSG's Agreement, Dillon knew he had a duty to maintain the secrecy of these trade secrets and return those trade secrets in his possession upon the separation from the company.

88. Dillon also had a duty to maintain the secrecy of the trade secrets and to return those trade secrets in his possession upon the separation of his relationship with BSG by virtue of the Defend Trade Secrets Act, 18. U.S.C. § 1836.

89. Dillon wrongfully took and used BSG's trade secrets to advance his own pecuniary interests and those of LRC/Goley, in violation of his restrictive covenants and Federal law.

90. Dillon misappropriated BSG's trade secrets, or appropriated them without authorization, by taking and them for purposes not authorized by his contracts and specifically prohibited by his contracts

91. In violation of the DTSA, LRC/Goley misappropriated BSG's trade secrets by using the information Dillon unlawfully took in order to grow its own business and unlawfully compete.

92. Defendants' misappropriation of trade secrets was willful and malicious and for the purpose of gaining an unfair advantage in the industry,

93. Defendants' unlawful actions are continuing.

94. Unless Defendants are restrained and enjoined from using the subject trade secrets, BSG will suffer immediate and irreparable harm.

95. As a direct result of Defendants' actions, BSG has suffered, and will continue to suffer, irreparable harm and economic damages.

WHEREFORE, Plaintiff BSG prays for judgment in its favor and against Defendants Dillon, LRC, and Goley and for the following relief: (a) for entry of a temporary restraining order and preliminary and permanent injunction precluding Defendants from violating the restrictive covenants contained in the Agreement, (b) for entry of an award to the Company of compensatory damages for its loss of profits, lost goodwill, and loss of competitive advantage suffered in an amount which is in excess of $75,000 and to be shown in discovery; (c) for an entry of an award to the Company of monetary damages, pre- and post-judgment interest, damages, attorneys' fees, costs and expenses; and (d) for further relief as the Court deems just and reasonable.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ Michael Matula
Michael L. Matula    MO #47568
Jordan Kurdi    MO #72892
700 W. 47th St., Suite 500
Kansas City, MO 64112
Telephone: 816-471-1301
Facsimile: 816-471-1303
michael.matula@ogletree.com
jordan.kurdi@ogletree.com

**ATTORNEYS FOR PLAINTIFF**