## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| **BUILDER SERVICES GROUP, INC.** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| v. | ) |
| | ) |
| **LONNIE DILLON, LAKE** | )    **Case No. 2:24-cv-4092-BP** |
| **RESIDENTIAL COMMERCIAL** | ) |
| **INSULATION, LLC AND GOLEY** | )    **JURY TRIAL DEMANDED** |
| **INSULATION, INC.** | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFF'S SUGGESTIONS IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIINARY
## INJUNCTION

Defendant Lonnie Dillon ("Dillon") is a former manager of Plaintiff Builder Services Group, Inc. ("BSG") who quit without giving any notice, misrepresented his post-BSG career plans, and—despite having agreed not to—went to work for a director competitor (either Goley Inc., dba Goley Insulation, ("Goley") or Lake Residential Commercial Insulation, LLC dba LRC Insulations ("LRC")), misappropriating BSG's confidential information and trade secrets for the financial gain of all Defendants. The relationship between Goley and LRC is not entirely clear, but both hold themselves out as direct competitors of BSG. Dillon's employment with Goley/LRC is in violation of his Confidentiality, Intellectual Property Assignment, Non-Compete and Non-Solicitation Agreement ("Agreement"). Using BSG's trade secrets and in violation of his Agreement, Dillon is now working to expand Goley/LRC's business into BSG's market, soliciting BSG employees to set up new warehouse operations in Elson, Missouri for Goley/LRC. The full nature of what Dillon is doing for Goley/LRC can be more fully determined with discovery and sorted out at a preliminary injunction hearing.

Dillon—who agreed to six-figure compensation with BSG before quitting without notice—seemed to have solicited and encouraged employees of BSG (his former subordinates and one family member) to terminate their employment with BSG and join Dillon as an employee at LRC/Goley. Dillon has been diverting business from BSG to Goley/LRC using confidential information and trade secrets taken from BSG in violation of his restrictive covenants and Federal law. All Defendants are now using BSG's confidential information and trade secrets to unlawfully compete and tortiously interfere with BSG's business.

BSG now seeks a Temporary Restraining Order under Federal Rule of Civil Procedure 65(b) asking for targeted relief to prevent the loss of customers or misuse of BSG confidential information pending a preliminary injunction hearing.

## I.  FACTUAL OVERVIEW

### A.  Background on BSG.

BSG is a leading installer and specialty distributor of insulation and building material products to the North American construction industry, with approximately 235 branches across the country.[1] BSG's business and success depends upon the customer contacts, goodwill, and relationships developed by BSG and its employees, the repeat business of BSG's customers, and the continued confidentiality and ownership of its and its affiliates' proprietary information and trade secrets.[2] BSG has invested substantial time, money, and effort developing and maintaining relationships with its customers.[3] In connection with its growing business and to maintain its competitive edge in the industry, BSG has acquired businesses in smaller markets.[4]

---

[1] Exhibit 1, Declaration of Nathan Sohocki, ¶ 3.

[2] Exhibit 1, ¶ 4.

[3] Exhibit 1, ¶ 5.

[4] Exhibit 1, ¶ 6.

2

In connection with its business, BSG has developed and/or acquired and maintained certain business information, including, but not limited to, customer lists and documents containing customer identity information; information on pricing, margins, and sales to its customers; marketing information; sales data; financial information concerning BSG and its customers; and information concerning BSG's employees (the "Confidential and Trade Secret Information").[5] The Confidential and Trade Secret Information gives BSG a competitive advantage not enjoyed by other persons not in possession of the Confidential and Trade Secret Information.[6] The Confidential and Trade Secret Information is not generally known to, or readily ascertainable through proper means by individuals outside BSG.[7] BSG has invested considerable time, effort, and expense in establishing and developing the Confidential and Trade Secret Information, and in developing valuable and extensive trade, business, trade name, and goodwill among its customers and in developing contacts and business relationships with its customers.[8] BSG used, and continues to use, reasonable and diligent efforts to maintain and protect the Confidential and Trade Secret Information, including the use of non-disclosure, non-competition and non-solicitation agreements, password protected computer systems, and confidentiality policies limiting access of Confidential and Trade Secret Information.[9] The Company requires exempt employees to sign a Confidentiality, Intellectual Property Assignment, Non-Compete and Non-Solicitation Agreement ("Agreement"), pursuant to which they agree not to, among other things, work in the same or similar capacity for a competitor within a 100 mile radius from each location of the Company or its affiliates at which Employee provided services or any district, region, or geographic territory

---

[5] Exhibit 1, ¶ 8, 13.

[6] Exhibit 1, ¶ 10, 15.

[7] Exhibit 1, ¶ 11

[8] Exhibit 1, ¶ 12

[9] Exhibit 1, ¶ 16

assigned to Employee or in which Employee otherwise worked at any time during the period preceding the Employee's termination of employment, service or solicit the Company's customers or solicit the Company's employees.[10]

**B.    BSG purchased the assets of Defendant Dillon's former employer and Dillon is hired by BSG.**

Effective April 17, 2024, BSG acquired the assets of Dillon's previous employer, Nate's Insulation (also doing business as GreenSpace Insulation).[11] BSG offered a job to Dillon as Branch/Division Manager, which—*after negotiating for more pay and better terms that BSG had originally offered*—he accepted.[12] On April 19, 2024, Dillon signed an offer of continued employment with BSG (with annual projected compensation of over $100,000), an Integration Bonus Opportunity agreement, and a Confidentiality, Intellectual Property Assignment, Non-Compete and Non-Solicitation Agreement (the "Agreement").[13]

In his position as a Division Manager in the Eldon, Missouri area, Dillon had extensive and repeated contacts with GreenSpace's (then BSG's) customers, access to confidential information concerning those customers, and access to the phone numbers BSG advertised as a primary method by which customers may contact and secure and schedule BSG's services.[14] Dillon was effectively solely responsible for scheduling jobs and had personal relationships with 75% or more of GreenSpace customers. Dillon made statements to BSG representatives to the effect that he was responsible for several million dollars in sales revenue.[15]

---

[10] Exhibit 1, ¶ 17.

[11] Exhibit 1, ¶ 7.

[12] Exhibit 2, Declaration of Brian Betters, ¶¶ 7-8.

[13] Exhibit 2, ¶ 8 (Exhibits 2A, 2B, 2C). A true and correct copy of the Agreement is also attached as Exhibit 1 to the Complaint.

[14] Exhibit 1, ¶ 20

[15] Exhibit 1, ¶ 20

Dillon was involved in at least 70% of GreenSpace Insulation's sales, was familiar with marketing plans/strategies, ongoing jobs/projects and coordinating employee work schedules. Dillon's role with Nate's Insulation was so substantial, and he was so involved with all aspects of business operations, that he represented himself as an "owner," including using business cards indicating he was an "owner" (although he did not actually own stock or an equity interest in GreenSpace).[16]

### C. Dillon quits without notice, lies about his plans, and goes to work with Goley/LRC to compete against BSG

Like BSG, Defendants LRC/Goley specializes in installing insulation products for both residential and commercial buildings, and directly compete with BSG.[17] On May 11, 2024, an employee of Goley contacted Dillon via his BSG email regarding an "[o]pportunity" to speak with DeWayne Goley about joining the Goley "team" given their "interest in [Dillon's] market."[18]

Less than two weeks later, Dillon resigned from BSG giving "no notice"; when asked about his plans, Dillon misled BSG representatives, saying that he was going to work for a "buddy who did construction."[19] Contrary to what he told BSG representatives, Dillon was not "going to work with a buddy who did construction" but was actually going to work for LRC/Goley. LRC and Goley have corporate offices located in Illinois but provide installation services in and around the Eldon, Missouri area, where Dillon worked while employed with BSG.[20] Although a competitor to BSG, LRC/Goley did not previously have offices or physical operations in or around Miller County prior to employing Dillon.[21] Consistent with Goley's

---

[16] Exhibit 1, ¶ 21.

[17] Exhibit 1, ¶ 25.

[18] Exhibit 3, email dated May 11, 2024 from Goley representative to Dillon.

[19] Exhibit 1, ¶ 23.

[20] Exhibit 1, ¶ 26.

[21] Exhibit 1, ¶ 26.

interest (as stated in its May 11 recruiting email to Dillon), Dillon is now setting up new Goley/LRC branch/warehouse operations in the Eldon, Missouri area, and is working with at least three former BSG employees in that competitive effort.[22]  In total, since Dillon quit, 11 BSG employees have left, most with no-notice, and with at least three of the 11 former employees being seen working with Dillon at LRC/Goley at 720 E. 5th. Street.[23]

When Dillon's employment with BSG ended, he maintained his sole access to two phone numbers used for BSG business that were displayed on BSG trucks (*i.e.*, advertising) and which BSG customers (and potential customers) commonly used for communications regarding BSG's business, thereby preventing BSG from receiving phone calls from its customers or generating new business. It is reasonable to believe that Dillon also used customer calls intended for BSG to solicit and procure BSG's business for himself and his new employer, LRC/Goley.[24] Dillon, individually and presumably as an agent of LRC or Goley, failed to fulfill appointments that had been scheduled with customers on behalf of BSG of which he was aware but other BSG representatives were not, thereby harming BSG's goodwill and reputation with its customers.[25]

On May 29, 2024, the Company sent a Request to Immediately Cease and Desist Illegal Activities, reminding Dillon of the existence of the Agreement and putting LRC/Goley on notice that the Agreement contained certain post-termination obligations of Dillon.[26]

**D. The Non-Competition and Non-Solicitation Agreement.**

Relevant portions of the Agreement include the following:

5. <u>Need for Covenants</u>. Employee understands that the Company and its Affiliates have spent and will continue to spend substantial amounts of time, money and effort to develop their business, Confidential Information,

---

[22] Exhibit 1, ¶¶ 24, 25, 27.

[23] Exhibit 1, ¶ 28.

[24] Exhibit 1, ¶ 29.

[25] Exhibit 1, ¶ 30.

[26] True and correct copies of this request is attached as Exhibit 3 to the Complaint, and incorporated herein by reference.

reputation, goodwill (both associated with their respective trade names and geographic areas of business), and their customer, supplier and employee relationships. Employee further understands that Employee will benefit from those investments and efforts. Employee acknowledges that Employee's use of any such matters to compete against the Company or its Affiliates in an unrestricted manner would be unfair and detrimental to the Company and its Affiliates. Employee agrees that taking advantage of any of the above-identified investments of time, money or effort expended by the Company and its Affiliates would unfairly place the Employee at a competitive advantage over the Company and its Affiliates. Employee further acknowledges the Company's and its Affiliates' need to protect their business interests by reasonably restricting Employee's ability to compete with them. Finally, Employee acknowledges that the Company would not employ, or continue to employ, Employee without Employee's agreement to be bound by the provisions of this Agreement.

6. <u>Definitions</u>.

   (a) "Affiliate" means, as to any person or entity, any other person or entity (i) that directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such person or entity or (ii) that has the power directly or indirectly to direct or cause the direction of the management and policies of such person or entity, through the ownership of voting securities, by contract or otherwise.

   (b) "Competitive Capacity" means performing the same or similar duties as those performed by Employee on behalf of the Company at any time during the twenty-four (24) month period preceding the date of Employee's termination of employment.

   (c) "Competitive Products" means any product or service offered by the Company or its Affiliates in the Territory or any product or service that directly or indirectly competes with or is substantially similar to such product or service. For illustrative purposes, these products may include insulation products, fireplaces, gutters, garage doors, and closet shelving.

   (d) "Competitor" means any person or entity (including Employee or an entity that Employee becomes affiliated with or renders services to) that offers, or is actively planning to offer, Competitive Product within the Territory.

   (e) "Customer" means all customers and actively sought prospective customers of the Company and/or any of its Affiliates with whom Employee had contact in the performance of Employee's duties at any time during the twenty-four (24) month period preceding the date of Employee's termination of employment.

(f) "Territory" means the area comprising a one hundred (100) mile radius from each location of the Company or its Affiliates at which Employee provided services or any district, region, or geographic territory assigned to Employee or in which Employee otherwise worked at any time during the twenty-four (24) month period preceding the date of Employee's termination of employment.

(g) "Restricted Period" means the period of Employee's employment with the Company or an Affiliate and for a period of twelve (12) months following date of Employee's termination of employment for any reason, whether voluntary or involuntary.

(h) "Directly or indirectly" means conduct taken individually, through other individuals, or as a partner, shareholder, member, officer, director, manager, employee, salesperson, independent contractor, agent, or consultant for any other individual or entity.

7. <u>Non-Solicitation/Non-Interference</u>. During the Restricted Period, Employee shall not, either for Employee's own account or for or on behalf of any Competitor, directly or indirectly, take any of the following actions:

(a) Contact or otherwise solicit any employee, consultant, or independent contractor of the Company with the intention of encouraging such person to terminate his or her employment or other relationship with the Company or any of its Affiliates, or employ or otherwise hire or engage any such person;

(b) Solicit, call upon, accept work and/or orders for product from, or initiate communication or contact with any Customer for the purpose of offering Competitive Products to such Customer, or otherwise offer Competitive Products to such Customer;

(c) Solicit, call upon or initiate communication or contact with any Customer, vendor or supplier of the Company or any of its Affiliates for the purpose of encouraging such person to terminate, place elsewhere or reduce the volume of its business with the Company or its Affiliates; or

(d) Otherwise attempt to directly or indirectly interfere with the Company's or any of its Affiliates business or its relationship with its employees, independent contractors, vendors, suppliers or Customers.

8. <u>Non-Competition</u>. During the Restricted Period, Employee shall not, either for Employee's own account or for or on behalf of any Competitor, directly or indirectly, take any of the following actions:

(a) (i) Have an ownership or financial interest in a Competitor, (ii) advise or consult with a Competitor concerning competitive activity in the Territory,

or (iii) otherwise be employed by or provide services in a Competitive Capacity to a Competitor in the Territory;

(b) Engage in the production, sale or distribution of Competitive Products in the Territory; or

(c) Market, sell, or otherwise offer or provide Competitive Products in the Territory.

Dillon agreed to abide by the terms of the Agreement, including its non-competition and non-solicitation covenants. But after negotiating for higher pay and a potentially substantial integration bonus, Dillon must have found an even better offer from Goley/LRC, which—as its May 11 recruiting email indicated—was looking to poach to advance its new "interests in the market" and establish new operations there. The fact that he might have found a better deal does not excuse Dillon from abiding by the terms of the Agreement.

## II. LEGAL ARGUMENT

Dillon and BSG agreed that Florida law applied to the Agreement.[27] Florida law, and courts applying it, routinely recognize injunctive relief as an appropriate vehicle for the enforcement of non-competition and non-solicitation agreements. *See, e.g.*, Fla. Stat. § 542.355(1)(j) ("A court shall enforce a restrictive covenant by any appropriate and effective remedy, including, but not limited to, temporary and permanent injunctions."); *Allied Universal Corp. v. Given,* 223 So.3d 1040, 1044 (Fla. 3rd DCA 2017) ("[N]othing short of an injunction would prevent [a] loss" of customer relationships and goodwill resulting from a "breach of a non-compete agreement[.]"); *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1306 (S.D. Fla. Dec. 2, 2004) (finding injunction proper where defendant could implement knowledge of prior employer in position with

---

[27] Exhibit 2C, ¶ 8. The Agreement also contained a choice of venue provision that would have otherwise required Defendant Dillon to litigate/defend himself in Florida, but for efficiency, convenience, and avoid the possibility of jurisdictional disputes, BSG will litigate in Missouri. BSG originally filed suit in Miller County (where Dillon lives and works) but could not get its request for a temporary restraining order heard for weeks, and has refiled its claims in this Court.

9

direct competitor); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1559 (S.D. Fla. 1992) ("Florida courts have repeatedly held that injunctive relief is appropriate where customer lists are involved.").

Injunctive relief is properly granted when an employer seeks to enforce a non-compete agreement as long as the covenant "is reasonable in time, area, and line of business," and the employer shows a "legitimate business interest justifying the restrictive covenant." Fla. Stat. § 542.355(1). A temporary restraining order and preliminary injunction are appropriate where the moving party establishes "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs whatever danger the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Forsyth Cnty. V. U.S. Army Corps Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011). As explained below, BSG has met this burden.

### A. BSG is Likely to Prevail on the Merits

To show the required likelihood of success on the merits, the moving party need only "make a showing of likely or probable . . . success at trial on one or more claims." *Southeastern Mechanical Svcs., Inc. v. Brody*, Case No. 8:08-cv-1151-T-30EAJ, 2008 WL 4613046 at * 9 (M.D. Fla. Oct. 15, 2008). A showing of "certain[ty]" is not required. *Id.*

#### 1. BSG's Breach of Contract Claim Will Likely Succeed Against Dillon.

##### a. A Valid Restrictive Covenant Exists.

Under Florida law, a breach of contract claim requires: "(1) the existence of a valid contract; (2) a breach of the contract; and (3) damages resulting from the breach." *APR Energy, LLC v. Pakistan Power Res.*, LLC, 653 F. Supp. 2d 1227, 1241 (M.D. Fla. 2009); *Crom, LLC v.*

*Preload, LLC*, 380 F. Supp. 3d 1190, 1200 (N.D. Fla. March. 31, 2019) (citing *Beck v. Lazard Freres & Co.*, LLC, 175 F.3d 913, 914 (11th Cir. 1999)).

A valid contract exists under Florida law "when the three elements of contract formation are present: offer, acceptance and consideration." *In re Harrell* 351 B.R. 221, 241 (Bankr. M.D. Fla. 2006) (citing *Pezold Air Charters v. Phoenix Corp.*, 192 F.R.D. 721, 725 (M.D. Fla. 2000)). Here, BSG offered Dillon employment with a salary exceeding $100,000 annually and a minimum annual bonus of $10,000, as well as allowing him continued access to BSG confidential information and access to BSG customer, in exchange for his execution of the Agreement. Dillon accepted the offer, as demonstrated by his signature on the written document, as witnessed by Brian Betters during BSG's onboarding process.[28] BSG fully complied with its contractual obligations under the Agreement.

It is well-established in Florida law that a restrictive covenant which prohibits competition following employment is enforceable so long as it is reasonable and necessary to protect legitimate business interests. Fla. Stat. § 542.335(1) (2020). A court "shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate interests established by the person seeking enforcement." Fla. Stat. § 542.335(1)(h) (2020). This legislation "is designed to allow employers to prevent their employees and agents from learning their trade secrets, befriending their customers, and then moving into competition with them." *Pino v. Spanish Broadcasting System of Florida, Inc.*, 564 So. 2d 186, 188 (Fla. 3rd DCA 1990); *Miller Mechanical, Inc. v. Ruth*, 300 So. 2d 11, 12 (Fla. 1974).

The restrictions contained in the Agreement are reasonable and necessary to protect BSG's legitimate business interests. The term "legitimate business interest," as defined by Florida law,

---

[28] Ex. 2, ¶¶ 7-8.

includes, but is not limited to: trade secrets; valuable confidential business and professional information; substantial relationships with specific prospective or existing customers, patients, or clients; customer goodwill associated with an ongoing business; and extraordinary or specialized training. Fla. Stat. § 542.335(b).

A two-year restraint is presumed reasonable under Florida law. Fla. Stat. § 542.335(d)(1) and (e). By virtue of his employment and his management with BSG and with the BSG purchase of Nate's Insulations' assets, Dillon was inexorably and intimately knowledgeable of BSG's trade secrets, employees, customers, and the needs, preferences, likes and dislikes of their customers and vendors. Dillon was BSG's Division Manager and lead salesperson in Eldon, Missouri and the surrounding areas. Given rural nature of this area, BSG's customer base is spread out over a large distance, rendering the 100-mile geographic reasonable and no broader than necessary. When armed with his comprehensive knowledge of BSG's trade secrets, business operations, and customers, Dillon possesses an unfair competitive advantage in the marketplace that is incapable of quantification, an advantage that he passes on to his new employer, a direct competitor of BSG. Without the enforcement of the protections afforded by the Agreement, BSG is exposed to the risk of unfair competition. Therefore, a two-year and 100-mile restriction on competition and solicitation for someone in Dillon's position, is certainly reasonable and necessary.

Once it has been shown, as here, that the restrictive covenant sought to be enforced is reasonable and necessary to protect the legitimate business interests of the employer, then the covenant must be enforced. Fla. Stat. § 542.335(1); *Balasco v. Gulf Auto Holding, Inc.*, 707 So.2d 858, 859 (Fla. 2nd DCA 1998). The burden is on the party opposing enforcement of the restrictive covenant to prove that a specified restraint is "overbroad, overlong, or otherwise not reasonably necessary to protect the established business interest or interests." *Balasco*, 707 So.2d at 859.

Even if the restrictions in the Agreement were overly broad in scope of some other respect, Florida law allows the restrictions to be modified and enforced accordingly. "[t]he correct procedure is for the Court to modify, or "blue pencil," the agreement and award an appropriate remedy." *PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1227 (M.D. Fla. 2012) (citing Fla. Stat. § 542.335(1)(c) ("If a contractually specified restraint is overbroad, overlong, or otherwise not necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief necessary to protect such interest or interests).

> ### b. *Dillon has breached the Agreement.*

Dillon has violated his Agreement in at least three ways:

(1)     he has breached Paragraph 8 of the Agreement in many ways, including being employed by and working for a "Competitor" (Goley or LRC) in a "Competitive Capacity" and is marketing, selling, or "otherwise offering" "Competitive Products" within the "Restricted Territory" and within the "Restricted Period," all as defined by the Agreement;

(2)     he has breached Paragraph 7 of the Agreement, or is reasonably likely to do so given his current employment, by soliciting and/or servicing BSG's customers based on the relationships generated while working at BSG, as well as through his continued access to phone numbers used by BSG customers and prospective customers; and

(3)     he has breached Paragraph 7 of the Agreement by encouraging other employees of BSG to terminate their employment with BSG and in at least three cases, follow him to LCR/Goley.

> ### 2. The Tortious Interference Claim Will Likely Succeed against LRC/Goley.

Establishing a claim of tortious interference with a contract requires proof of: (1) a contract (2) defendant's knowledge of the contract; (3) a breach induced or caused by defendant's

intentional interference; (4) absence of justification; and (5) damages. *Rice v. Hodapp,* 919 S.W.2d 240, 245 (Mo. banc 1996). When interference with a contract is at issue, as opposed to be a mere business expectancy, as here, the "absence of justification" element only requires plaintiff show "the defendant lacked a legal right to justify his actions." *Horizon Memorial Group, L.L.C. v. Bailey*, 280 S.W.3d 657, 662 (Mo. Ct. App. 2009). Because LRC/Goley does not have a "legitimate interest, economic or otherwise," in the Agreement between BSG and Dillon, BSG need not show that LRC/Goley used "improper means" in inducing Dillon to breach the Agreement. *See Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 590 (Mo. App. E.D. 2008).

Here, there is a valid contract between BSG and Dillon: the Agreement. LRC/Goley knew of this contract based on the cease-and-desist letter BSG sent to both Defendants, but could have been earlier when Dillon hired or when he was recruited. Despite knowing of Dillon's employment with BSG, as evidenced by Goley's May 11 recruitment email to Dillon's BSG email account, LRC/Goley induced Dillon to terminate his employment with BSG and enter into employment with LRC/Goley, in violation of the Agreement. Upon learning of the Agreement between BSG and Dillon which prohibits Dillon's employment with LRC/Goley, LRC/Goley has continued to employ Dillon, and is continuing to interfere with the Agreement. LRC/Goley has no legitimate interest, economic or otherwise, in the Agreement, and therefore acts without legal justification. As discussed throughout this motion, BSG has suffered and continues to suffer damages based on Defendants' conduct. Upon this evidence, BSG is likely to prevail on its tortious interference claim against LRC/Goley.

### 3. The DTSA Claim Will Likely Succeed

To establish a claim for misappropriation of trade secrets under the DTSA, a plaintiff must show the existence of a protectable trade secret and misappropriation of that trade secret." *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 955 (8th Cir. 2023). "Misappropriation"

14

is the "disclosure or use of a trade secret of another without express or implied consent" by someone who "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who had used improper means to acquire the trade secret." *Id.* at 956 (8th Cir. 2023).

a.   **A Protectable Trade Secret Exists.**

A "trade secret" is information that "the owner thereof has taken reasonable measures to keep . . . secret" and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* at 955 (quoting 18 U.S.C. § 1839(3)). BSG has identified several categories of this type of information that Dillon- -as a self-characterized "owner" of GreenSpace, had access to and surely is using in opening a new Goley/LCR warehouse operation to compete with BSG near Eldon, Missouri: customer lists and documents containing customer identity information; information on pricing, margins, and sales to its customers; marketing information; sales data; financial information concerning BSG and its customers; and personnel information concerning BSG's employees. *See, e.g.*, *id.* (finding that trade secrets encompassed "customer lists, rental information, pricing information, and marketing strategies"). This non-public information has economic value because BSG "derives economic benefit" from its not being readily known or ascertainable. *Id.*

BSG also took reasonable measures to protect these trade secrets. Courts regularly find that treating the information as confidential, including by labeling any documents as such; requiring employees to sign confidentiality, non-competition, and non-solicitation agreements; or distributing protected information on a need-to-know-basis constitute reasonable measures to maintain secrecy. *Ahern*, 59 F.4th at 955 (non-disclosure, non-competition agreements as a reasonable measure to keep information secret for DTSA purposes); *Bancorp Servs., L.L.C. v.*

15

*Hartford Life Ins. Co.*, No. 4:00-CV-70CEJ, 2002 WL 32727076, at *4 (E.D. Mo. Feb. 25, 2002) (finding "written confidentiality agreement[s]" to be "an important factor to consider in determining whether reasonable steps were taken"). As explained above, BSG's efforts to protect its trade secrets far exceed what the courts have defined as "reasonable measures."

        **b.**        **Defendants Has Misappropriated the Trade Secrets Through Improper Means.**

Goley/LCR targeted Dillon because they knew he had information about "BSG's market." Within a couple weeks, Goley/LCR are starting operations in Eldon, Missouri and have hired Dillon and at least three other former BSG employees. Dillon is doing the same or substantially similar job to what he did for BSG, and it is reasonable to infer that in doing so he has used, or disclosed to his new employer, BSG trade secrets to get a new operation going this quickly. Under the DTSA, "improper means" "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Farm J., Inc. v. Johnson*, No. 4:19-CV-00095-SRB, 2019 WL 1795945, at *2 (W.D. Mo. Apr. 24, 2019) (quoting 18 U.S.C. § 1839(6)(A)). Thus, Dillon's breach of the Agreement, and LRC/Goley's *inducement of Dillon to breach the Agreement*, constitute "improper means" for acquiring BSG's protectable trade secrets. *Id.* at *2-3.

        **B.**        **Absent at Temporary Restraining Order, BSG Faces a Threat of Immediate and Irreparable Harm.**

BSG will suffer immediate and irreparable harm if Dillon is permitted to continue to breach the Agreement by working for a direct competitor of BSG, maintaining BSG's business phone numbers in the Kansas City and Eldon, Missouri areas, soliciting BSG's employees, and soliciting BSG's customers; as well as by LRC's/Goley's tortious interference of the Agreement between Dillon and BSG, by continue to employ him. In fact, under Florida law, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking

enforcement." Fla. Stat. § 542.355(1)(j); *Lynch v. Silcox*, No. 01-8800-CIV, 2001 WL 1200656, at *5 (S.D. Fla. Oct. 4, 2001); *see also Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 640 F. 2d 560, 568 (5th Cir. 1981) (considering the violation of a legal right must generally be considered in concert with the showing of a "substantial threat of irreparably injury" in determining the propriety of injunctive relief).

This burden-shifting rule also applies to a suit of tortious interference against a former employee's new employer where that employment constitutes a violation of a restrictive covenant. *See AmeriGas Propane, Inc. v. Sanchez*, 335 So. 3d 1253, 1257 (Fla. Dist. Ct. App. 2021) (placing burden to rebut presumption of irreparable harm on new employer who "took advantage of the customers solicited (and enrolled) by [the employee]").

Additionally, it would be difficult to impossible to fully calculate monetarily the damage to BSG that Defendants could inflict by interfering with BSG's customer relations. Indeed, one reason for granting injunctive relief is the fact that actual damages may be difficult to calculate, particularly when the loss of a customer is, as a practical matter, the loss of a referral source to new business. *See Atomic Tattoos, LLC v. Morgan*, 45 So. 3d 63, 66 (Fla. Dist. Ct. App. 2010) ("Monetary damages would be difficult to determine because the number of "sales" lost, as well as any potential profit, would be nearly impossible to calculate, particularly with a continuing breach."). Moreover, it would be difficult to monitor Defendants' activities and whether they was soliciting customers or employees in violation of the Agreement. No legal remedy would enable BSG to recoup the competitive advantage which will be irretrievably lost if Defendants are permitted to continue violating (and tortiously interfering with) the valid and enforceable Agreement between BSG and Dillon, as well by maintaining sole access to BSG's business phone numbers. Based on Dillon and Goley's illegal activities, BSG has now been forced to recruit

employees from other locations to complete work that should have been done by those employees who recently left due to Dillon's departure. BSG continues to incur additional costs like labor, travel, expenses, potential delay claims, and recruiting costs while attempting to replace 1/3 of the branch's workforce as a direct result of Dillon's actions.

### C. The Harm to BSG Outweighs the Harm to Defendants

The state of balance between the certainty of harm to BSG if Defendants are not enjoined, and the temporary potential harm to Defendants if the requested relief is granted, weighs heavily in favor of issuance of the temporary restraining order. The damage to the business and competitive standing of BSG would, as discussed above, be irreparable, whereas Defendant will only be prohibited from servicing his former customers and soliciting BSG employees for a limited period until a preliminary injunction hearing can be held. Moreover, BSG does not seek to prevent Dillon from using his general skills and knowledge, nor LRC/Goley from using those general skills. Rather, BSG simply wishes to enforce the non-compete, non-competition and non-solicitation of clients and employees obtained by Dillon while the employer-employee relationship existed, and thus binding on LRC/Goley as Dillon's new employer. However, if immediate injunctive relief is denied, BSG will be irreparably damaged, even if it ultimately prevails upon the merits. The damage, once done, cannot be undone; and this factor thus heavily favors granting the requested relief.

Court applying Florida law regularly find the balance of hardship tip in favor of the employer seeking to enforce a restrictive covenant agreement. In *North American Products Corp. v. Moore,* 196 F. Supp. 2d 1217, 1231 (M.D. Fla. Feb. 7, 2002), the court found that the balance of harm favored a preliminary injunction against a former sales representative who resigned to a run a business that competed with his former employer. The former sales representative's solicitation of the employer's customers interfered with the employer's relationships with

customers and had a high possibility of damaging the employer's reputation and goodwill, whereas the harm to the employee was insignificant, in that he would only be prohibited from soliciting his prior customers from the employer's business. *Id.* Similarly, in *Medi-Weightloss Franchising United States, LLC v. Medi-Wieghtloss Clinic of Boca Raton,* LLC, 2012 U.S. Dist. LEXIS 14276, at *30-31 (M.D. Fla. 2012), the court concluded that the competition with former employees who agreed not to engage in competition, along with the loss of the exclusivity and confidentiality of plaintiff's proprietary information, and likely dilution and confusion associated with its intellectual property and products and services, all tipped the balance of harm in favor of the plaintiff.

Here, BSG faces substantial losses in the marketplace as well as the irreparable loss of client relationships and customer goodwill. Dillon, on the other hand, will not suffer any harm by complying with the terms of the Agreement he voluntarily entered into. He would merely abide by the status quo. The balance of the equities requires the issuance of injunctive relief to BSG.

> **D.     The Public Interest will be Served by Granting the Temporary Restraining Order**

Considerations touching on the public interest also weigh heavily in favor of granting temporary injunctive relief. Although the harm to BSG resulting from the loss of its clients and goodwill cannot be adequately measured in monetary terms alone, the anticipated pecuniary investment loss in terms of expenditure of time, money, and effort in the development of that client base is substantial. BSG paid a fair and substantial consideration to Defendant for his services to the Company and Defendants are unfairly attempting to deprive BSG of the benefit of its bargain.

Moreover, there is a significant societal interest to be served in safeguarding businesses from unfair competitive practices and the sanctity of contract. "The public has an interest in protecting and enforcing valid contracts." *Ryan, LLC v. Evans*, 8:12-CV-289-T- 30TBM, 2012 WL 1532492 at *9 (M.D. Fla. Mar. 20, 2012), report and recommendation adopted, 8:12-CV-289-

T-30TBM, 2012 WL 1551285 (M.D. Fla. Apr. 30, 2012). In addition, "[a]s Florida has recognized by the enactment of Florida Statutes Section 542.335, there is an especially strong public interest in protecting confidential information and enforcing restrictive covenants, as that promotes legitimate business interests." *MEDai Inc. v. Quantros, Inc.*, 6:12-CV-840-ORL-37, 2012 WL 3542412 at *7 (M.D. Fla. Aug. 16, 2012) (citing *Autonation*, 347 F. Supp. 2d at 1308.

As such, enjoining Defendants would promote the public interest, because bad actors, such as Dillon, LRC, and Goley, should not be allowed to profit from their wrongdoing. Companies should be confident that the law protects their legitimate business interests, including their client relationships and confidential business information, which are developed over years of substantial time, effort, and expense. Indeed, "[t]he public has an interest in protecting businesses from theft of confidential information, and remedies at law are insufficient because of the time sensitive nature of confidential information and the possible advantage it could engender." *Hatfield v. AutoNation, Inc.,* 939 So. 2d 155, 158 (Fla. 4th DCA 2006).

The Agreement in this case is reasonable and enforceable. Dillon had the freedom to voluntarily enter into the Agreement and did so knowing the covenants it contained and the possibility of injunctive relief if he violated those covenants. The public interest, therefore, favors a temporary restraining order prohibiting the further breach of the Agreement. There is a significant public interest to be served by enforcing contracts, such as the Agreement, to prevent former employees from using client goodwill and confidential information acquired during their employment to the detriment of their former employer and benefit of a competing business.

### III.    CONCLUSION AND RELIEF REQUESTED

Wherefore, for all these reasons, BSG's Motion for Temporary Restraining Order should be granted, awarding relief set forth in that Motion. BSG Further requests that the Court set this matter for a preliminary injunction hearing.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.

/s/ Michael Matula
Michael L. Matula        MO #47568
Jordan Kurdi             MO #72892
700 W. 47th St., Suite 500
Kansas City, MO  64112
Telephone:  816-471-1301
Facsimile:  816-471-1303
michael.matula@ogletree.com
jordan.kurdi@ogletree.com

**ATTORNEYS FOR PLAINTIFF**