# EXHIBIT 2

## DECLARATION OF BRIAN BETTERS

1. My name is Brian Betters. I am over 21 years of age, I am of sound mind, and I am competent to make this declaration. I have personal knowledge of all facts stated in this declaration.

2. I am employed by TruTeam, a subsidiary of Builder Service Group, Inc. ("BSG") as a Director of Operational Development.

3. In that role, I was involved and have first-hand knowledge of events related to BSG purchase of assets from Nathan's Insulation LLC, which operated under the name "Nate's Insulation" or "GreenSpace Insulation." (hereinafter "GreenSpace").

4. In connection with the asset purchase transaction closing, I and other BSG representatives went to Eldon, Missouri to assist with the transition of the business operations to BSG, including hiring former employees of GreenSpace for employment with BSG.

5. Lonnie Dillon was a former GreenSpace managerial employee who for years had overseen almost all operations for the business. Mr. Dillon was involved in at least 70% of GreenSpace's sales, was familiar with marketing plans/strategies, ongoing jobs/projects and coordinating employee work schedules. Mr. Dillon made statements to the effect that he was responsible for several million dollars in sales revenue.

6. On April 18th, Trudy Ince (Human Resources Business Partner for BSG) and I, along with Mr. Dillon, met with former Nathan Insulation employees to review and sign BSG employment offer letters, and, for employees who were not part-time or "non-exempt", to review and sign BSG Confidentiality/Intellectual Property Assignment, Non-Compete and Non-Solicitation Agreements ("Non-Competition Agreements"). Ms. Ince had prepared packets of these documents for each of the former GreenSpace employees being offered employment by BSG. Because of his role at GreenSpace, in addition to an employment offer and Non-Compete, BSG also presented Mr. Dillon an Integration Bonus Opportunity reflecting potential additional compensation to be paid if Mr. Dillon became a BSG employee and remained with BSG for a period of time. Mr. Dillon did not sign his papers on April 18th because he wanted to further discuss/negotiate various provisions.

7. On Friday, April 19th, approximately at 9:30 in the morning, I met with Mr. Dillon in his office to discuss/further negotiation employment terms.

    (a) We agreed to modify/clarify certain compensation terms, which I noted on the documents (in blue ink). Mr. Dillon signed the Offer of Employment (in black ink). **Exhibit A** to this Declaration is a true and accurate copy of the Offer of Employment document that Mr. Dillon signed during our meeting.

    (b) We also agreed to changes to the Integration Bonus Opportunity, which I noted in blue ink and which Dillon printed his name, signed, dated and "accepted" the

document, all in the black ink. **Exhibit B** to this Declaration is a true and accurate copy of the Integration Bonus Agreement that Mr. Dillon and I signed during our meeting.

    (c)    Mr. Dillon and I also signed the Non-Competition Agreement which Mr. Dillon wrote on/signed in black ink. **Exhibit C** to this Declaration is a true and accurate copy of the Non-Competition Agreement that Mr. Dillon and I signed during our meeting.

8.    Later that day, I asked Majorie Wiggins (also a BSG representative who was on site the office) to scan the documents that the various employees, including Mr. Dillon, had signed and to provide the scanned versions to Ms. Ince.

I have been given an opportunity to review this declaration and make any necessary changes before signing. I declare under penalty of perjury under the laws of the United States that the above statements are true and correct.

DocuSigned by:
*Brian Betters*
C4A3923AFA524F8...

Date: 06-Jun-2024

Brian Betters

# EXHIBIT A



**Personal and Confidential**

April 5, 2024

Lonnie Dillon
119 W. North
Eldon, MO 65026

RE: **Offer of Employment**

Dear Lonnie,

We are excited about the prospect of Nate's Insulation becoming part of the TopBuild family of companies and are excited for you to join our team on April 1̶5̶ 18, 2024, under the conditions described below:

**Continued Employment**

You are being offered the position of Branch Manager. In this capacity, you will report to _____, [title]. The following summarizes our offer:

Your rate of pay will be $~~4,166.67~~ $4,312.50 semi-monthly. Projected annually, it amounts to $~~100,000.00~~ $103,500.00. You should rely on the semi-monthly rate of pay to determine your actual annual compensation. Salaried employees are paid semi-monthly, on the 15th and the last workday of each month. Direct deposit is available. Applicable payroll deductions as required by state and federal law will be withheld from your paycheck, along with any voluntary deductions that you authorize.

**Employee Benefits**

TopBuild offers a benefits package, which includes comprehensive health insurance, a 401(k) Plan, as well as several other supplemental benefits. Enclosed is an explanation of our benefits package. You will be eligible for 7 company paid holidays along with Paid Time-off (PTO) in accordance with Company policy. Your benefits will be explained in detail during your new employee orientation.

**Confidentiality/Non-Competition Agreement**

As an employee of our Company, it is likely that you will become knowledgeable about confidential/proprietary information related to the operation, products and services of the Company, and its parents, affiliates, and subsidiaries as well as their respective customers and clients. To protect the interests of both the Company and our clients, employees are required to read, sign and return a Confidentiality and Non-Competition Agreement along with the signed offer letter.

**Next Steps**

1



We appreciate your efforts so far and look forward to having you as a future part of TopBuild. To accept this offer, please sign below and return to me. We believe we can offer you an exciting and challenging opportunity for your personal and professional growth, and we are excited about the value we know you can bring to the TopBuild team.

This offer is not being presented to all employees. Therefore, a material element of this offer is that Employee must keep this offer and its contents in strict confidence and not disclose it to any other individual except Employee's immediate family, tax adviser, legal counsel, or anyone required by law to know the contents.

Additionally, this letter is intended to answer many of the questions that you may have about your employment but should not be construed as a contract of employment or a binding obligation without unrestricted right of the Company to modify or terminate the provisions provided herein. In any case, at all times during your employment you will be an "at will" employee.

*2024 Minimum Bonus To Be Paid $10,000.00*

[insert Signature]

Nathan Sohocki

Accepted by:

_____
Lonnie Dillon

Date: 4-19-2024

2

Case 2:24-cv-04092-BP   Document 3-2   Filed 06/06/24   Page 6 of 19

# EXHIBIT B



**Personal and Confidential**

Date

Lonnie Dillon
Address
City, State, Zip Code

RE: **Integration Bonus Opportunity**

Dear Lonnie,

On behalf of the TopBuild family of companies, we are excited about the possibility of Nate's Insulation ("Nate's") becoming a part of our organization. We expect that Builder Services Group, Inc. ("BSG") will close on the acquisition of Nate's on or around April __, 2024 (the "Merger"). In anticipation of the Merger, I am pleased to provide you (the "Employee") with this conditional offer of an Integration Bonus opportunity. For the avoidance of doubt, if the Merger is not consummated on or around April __, 2024 (the "Merger Date"), this Agreement shall lapse and shall have no further force or effect and Employee shall not receive an integration bonus (as defined below), or any portion thereof.

**Integration Bonus Opportunity**

If Employee becomes an employee of BSG or another TopBuild affiliated company (the "Company") in connection with the Merger and remains an employee through the first and second anniversary of the Merger Date, the Employee will be eligible to earn a total integration bonus in the gross amount of one hundred fifty thousand and 00/100 dollars ($150,000.00) (the "Integration Bonus"), less all applicable taxes and withholdings, which shall be paid out in two separate equal amounts: (a) ~~one half on the first regular payroll after the first anniversary of the Merger Date; and~~ (b) the second half on the first regular payroll after the second anniversary of the Merger Date, provided each of the following additional conditions is satisfied:

*[handwritten margin notes: "or 37,500 @ 6 Months 37,500 @ 1 year"]*

(1) The Merger consummates on or around April __, 2024;
(2) Employee does not voluntarily resign prior to the second anniversary of the Merger Date;
(3) Employee is not terminated by the Company for "Cause" prior to the second anniversary of the Merger Date. Cause is defined as termination resulting from: (a) fraudulent conduct by Employee affecting the Company; (b) Employee's conviction of a felony; (c) violation by Employee of any criminal statute that has a material adverse effect on the financial condition of the Company; (d) any material breach of this Agreement by Employee; (e) a violation by Employee of any written policy of the Company; or (f) Employee's willful refusal to follow a lawful directive from management with the scope of work stated above;
(4) Employee continues to use his best efforts to perform the job responsibilities assigned to Employee by the Company through the second anniversary of the Merger Date;
(5) Employee does not breach any term or condition in this Agreement;
(6) Employee executes the Company's standard protective covenant agreement on or before April __, 2024; and
(7) Employee signs below on or before April __, 2024.

The Integration Bonus payments are in addition to Employee's regular salary, which will continue to be paid as usual during employment. The Integration Bonus shall not constitute compensation under any other employee benefits or plans in which Employee participates including, without limitation, benefits

1



under any bonus, commission, incentive, pension, retirement, life insurance, severance, disability or salary continuation plans.

Employee agrees and acknowledges that if Employee voluntarily leaves employment or is separated from employment with the Company for "Cause" at any time, Employee will not be entitled to receive any further Integration Bonus, or any portion thereof. Any Integration Bonus amount previously paid shall not be subject to forfeiture.

Employee hereby acknowledges and agrees that nothing in this offer creates a contract of employment nor restricts Employee's nor the Company's ability to terminate the employee's at-will employment relationship, or Employee's employment relationship as otherwise set forth in Employee's employment agreement, if any.

This offer is not being presented to all Nate's or Company employees. Therefore, a material element of this offer for which additional consideration has been provided is that Employee must keep this offer and its contents in strict confidence and not disclose it to any other individual except Employee's immediate family, tax adviser, legal counsel, or anyone required by law to know the contents. If Employee breaches this confidentiality promise, the offer will be rendered null and void and no bonus of any amount will be due and owing to Employee.

We look forward to having you as a future part of the TopBuild family of companies.

_Lonnie Dillon_

NAME

**Accepted by:**

_Lonnie Dillon_

Employee NAME

Date: 4-19-2024

2

# EXHIBIT C

# CONFIDENTIALITY, INTELLECTUAL PROPERTY ASSIGNMENT, NON-COMPETE AND NON-SOLICITATION AGREEMENT

This CONFIDENTIALITY, INTELLECTUAL PROPERTY ASSIGNMENT, NON-COMPETE AND NON-SOLICITATION AGREEMENT ("Agreement") is entered into by and between _Lonnie Dillon_ ("Employee") and Builder Services Group, Inc., a Florida corporation (the "Company," and together with its "Parents and Affiliates" (as defined below), including TopBuild Corp. and TopBuild Support Services, Inc., each a Delaware corporation, and Service Partners, LLC, a Virginia limited liability company, collectively, the "TopBuild Group"), is effective as of _4/18/2024_, 201_.

## Background

A.  The Company and its Affiliates are engaged in the business of selling and installing a wide range of products for new residential and commercial construction and existing home improvement projects throughout the United States, including insulation products, fireplaces, gutters, garage doors, closet shelving, and other products. The Company's business depends upon the preservation of goodwill and continued confidentiality and ownership of its and the rest of the TopBuild Group's proprietary information and trade secrets.

B.  The Company wishes to employ Employee on an at-will basis as a _Division Manager_ and Employee wishes to be so employed by the Company in this capacity. In this capacity, Employee will be granted contact with the Company's customers and will create and/or utilize the Company's goodwill with such customers.

C.  In carrying out Employee's duties to the Company, Employee will become familiar with the Company's and possibly other TopBuild Group confidential information and trade secrets and will acquire experience, skills and knowledge related to the Company's business.

D.  The parties agree that this Agreement is necessary to safeguard against the unauthorized disclosure or use of the TopBuild Group's confidential information and trade secrets and to preserve its goodwill and ongoing business value and to effectuate the assignment of the intellectual property rights with respect to all of Employee's "Work Product" (as defined below).

THEREFORE, in consideration of Employee's employment by the Company, the Company's willingness to disclose certain confidential information to Employee, the mutual promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## CONFIDENTIALITY

1. <u>Confidential Information</u>. Employee acknowledges that the Company and other entities forming part of the TopBuild Group have certain trade secrets and other confidential and proprietary information which they have acquired and developed, and will acquire and develop, at great effort and expense. Such trade secrets and information include, without limitation, confidential information, whether in tangible or intangible form, regarding the Company's products, services, marketing strategies, business plans, operations, costs, current or prospective customer information (including customer lists, requirements, creditworthiness, preferences and similar matters), product concepts, designs, specifications, research and development efforts, technical data and know-how, sales information (including pricing and other terms and conditions of sale), financial information, internal procedures, techniques, forecasts, methods, trade information, software programs, project

requirements, inventions and all other information which is not generally known to those outside the Company (collectively, "Confidential Information"). Confidential Information does not include information that is or becomes available to the public other than as a result of disclosure by Employee. Employee acknowledges that all Confidential Information, and all documents and other materials containing or embodying any Confidential Information, whether in electronic or printed form (collectively, "Confidential Materials"), as between Employee and the Company and/or its Affiliates, are and shall remain the exclusive property of the Company or its designated Affiliate, and nothing in this Agreement or any document relating to Employee's employment or engagement by the Company or any course of conduct between the Company and Employee shall be deemed to grant Employee, any rights in or to any portion of the Confidential Information or Confidential Materials.

2. Restricted Use of Confidential Information. In the course of Employee's employment, Employee will have access to and may help develop Confidential Information. Except as required in the performance of Employee's duties, Employee will not, either during Employee's employment or at any time thereafter, disclose any Confidential Information to others or use the Confidential Information for Employee's own benefit or for the benefit of others. All Confidential Materials and other records, files, and documents relating to the TopBuild Group's business shall remain the sole property of the TopBuild Group and may not be copied without written permission from the TopBuild Group's senior management. Upon the termination of Employee's employment, Employee agrees to promptly return all Confidential Materials and other records, files, documents and other materials relating to the TopBuild Group's business, whether in hard copy or electronic format. Employee shall not retain copies of such materials. All such items are to be delivered to the Company in care of its Director of Human Resources, 475 North Williamson Boulevard, Daytona Beach, FL 32114 within ten (10) calendar days of Employee's termination date. Failure to return such documents shall be deemed a material breach of this Agreement.

## INTELLECTUAL PROPERTY ASSIGNMENT

3. Inventions Retained and Licensed. Employee represents and warrants that Employee has disclosed to the Company all inventions, original works of authorship, developments, improvements, and trade secrets which were conceived of, reduced to practice, created or otherwise developed prior to Employee's employment with the Company which belong to Employee, which relate to the Company's business, products or services, and which are not subject to confidentiality, use or ownership restrictions imposed by a third party and have not been assigned to the Company or its designated Affiliate. Employee shall not incorporate into or use any of the foregoing in connection with any Company or other TopBuild Group entity's product or service without first providing written notice thereof to the Company and obtaining the Company's and/or its Affiliates' written consent. If in the course of Employee's employment with the Company, Employee incorporates into a Company or other TopBuild Group entity's product or service any of the foregoing, Employee hereby grants to the Company and its Affiliates a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use, sublicense and sell same as part of or in connection with such product or service.

4. Work Product. Employee agrees that, during his or her employment with the Company:

   (a) Employee will disclose promptly and fully to the Company all works of authorship, ideas, inventions, discoveries, improvements, trade secrets, designs, processes, software, or any improvements, enhancements, or any other intellectual property or any documentation of or to the same, or any other work product that Employee makes, works on, conceives, or reduces to practice, individually or jointly with others, whether prior to the date of this

Agreement and relating to the Company's or its Affiliates' products, services and/or business, or in the course of Employee's employment by the Company or during the six (6) months after termination of such employment, or with the use of the Company's or its Affiliates' time, materials or facilities, in any way related or pertaining to or connected with the present or anticipated business, products or services of the Company or its Affiliates, or which results from or is suggested by any work Employee may have previously done or may do for the Company or its Affiliates and whether produced during normal business hours or on personal time (collectively the "Work Product");

(b) All Work Product of Employee shall be deemed, as applicable, to be a "work made for hire" within the meaning of §101 of the Copyright Act. All intellectual property rights, including patent, trademark, trade secret and copyright rights, in and to the Work Product are and shall be the sole property of the Company and/or its designated Affiliate. To the extent that the Work Product is deemed not to be "work made for hire," this Agreement shall constitute an irrevocable assignment by the Employee of, and the Employee hereby assigns, to the Company or its designated Affiliate, all right, title and interest in and to all intellectual property rights in and to the Work Product. Any and all rights of whatever kind and nature, now or hereafter, to make, use, sell, license, distribute or otherwise transfer and reproduce such Work Product in any and all media throughout the world, are and shall be the sole property of the Company and/or its designated Affiliate. Employee hereby agrees to assist the Company and its Affiliates in any manner as shall be reasonably requested by them to protect the Company's and its Affiliates' interests in such intellectual property rights and to execute and deliver such assignments and other legal instruments or documents as the Company or its Affiliates shall request in order to effectuate the foregoing provisions and to enable the Company and/or its Affiliates to obtain protection of the Work Product throughout the world, including but not limited to, declarations of inventorship, powers of attorney, affidavits and other documents. Likewise, Employee hereby agrees to assist the Company and its Affiliates by executing such other documents and instruments which the Company or its Affiliates deem necessary to enable them to evidence, perfect and protect their rights, title and interest in and to the Work Product. Employee further agrees that Employee's obligation to execute or cause to be executed any such instrument or document shall continue after Employee's cessation of employment with the Company, regardless of reason for cessation of employment. If the Company or its Affiliates are unable because of Employee's mental or physical incapacity or for any other reason to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations assigned to the Company or its designated Affiliate in accordance herewith, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney in fact, to act for and in Employee's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by Employee, said power being coupled with an interest and being irrevocable. Employee will at any time, including after termination of Employee's employment with the Company, upon request, communicate to the Company and its Affiliates and its and their respective successors, assigns or legal representatives, such facts relating to the Work Product as may be known to Employee, and to testify, at the Company's or its Affiliates' expense, as to the same in any interference or other legal proceeding;

(c) Employee shall make and maintain adequate and current written records and evidence of all Work Product, including drawings, work papers, graphs, computer code,

documentation, records and any other document which shall be and remain the property of the Company or its designated Affiliate, and which shall be surrendered to the Company upon request and upon the cessation of Employee's employment with the Company, regardless of the reason for such cessation; and

(d) Employee hereby waives, and further agrees not to assert, any moral rights in or to the Work Product, including, but not limited to, rights to attribution and identification of authorship, rights to approval of modifications or limitations on subsequent modifications, and rights to restrict, cause or suppress publication or distribution of the Work Product.

## NON-SOLICITATION AND NON-COMPETITION

5. <u>Need for Covenants</u>. Employee understands that the Company and its Affiliates have spent and will continue to spend substantial amounts of time, money and effort to develop their business, Confidential Information, reputation, goodwill (both associated with their respective trade names and geographic areas of business), and their customer, supplier and employee relationships. Employee further understands that Employee will benefit from those investments and efforts. Employee acknowledges that Employee's use of any such matters to compete against the Company or its Affiliates in an unrestricted manner would be unfair and detrimental to the Company and its Affiliates. Employee agrees that taking advantage of any of the above-identified investments of time, money or effort expended by the Company and its Affiliates would unfairly place the Employee at a competitive advantage over the Company and its Affiliates. Employee further acknowledges the Company's and its Affiliates' need to protect their business interests by reasonably restricting Employee's ability to compete with them. Finally, Employee acknowledges that the Company would not employ, or continue to employ, Employee without Employee's agreement to be bound by the provisions of this Agreement.

6. <u>Definitions</u>.

   (a) "Affiliate" means, as to any person or entity, any other person or entity (i) that directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such person or entity or (ii) that has the power directly or indirectly to direct or cause the direction of the management and policies of such person or entity, through the ownership of voting securities, by contract or otherwise.

   (b) "Competitive Capacity" means performing the same or similar duties as those performed by Employee on behalf of the Company at any time during the twenty-four (24) month period preceding the date of Employee's termination of employment.

   (c) "Competitive Products" means any product or service offered by the Company or its Affiliates in the Territory or any product or service that directly or indirectly competes with or is substantially similar to such product or service. For illustrative purposes, these products may include insulation products, fireplaces, gutters, garage doors, and closet shelving.

   (d) "Competitor" means any person or entity (including Employee or an entity that Employee becomes affiliated with or renders services to) that offers, or is actively planning to offer, Competitive Products within the Territory.

   (e) "Customer" means all customers and actively sought prospective customers of the Company and/or any of its Affiliates with whom Employee had contact in the performance

Page 4 of 9

Case 2:24-cv-04092-BP   Document 3-2   Filed 06/06/24   Page 14 of 19

of Employee's duties at any time during the twenty-four (24) month period preceding the date of Employee's termination of employment.

(f) "Territory" means the area comprising a one hundred (100) mile radius from each location of the Company or its Affiliates at which Employee provided services or any district, region, or geographic territory assigned to Employee or in which Employee otherwise worked at any time during the twenty-four (24) month period preceding the date of Employee's termination of employment.

(g) "Restricted Period" means the period of Employee's employment with the Company or an Affiliate and for a period of twelve (12) months following date of Employee's termination of employment for any reason, whether voluntary or involuntary.

(h) "Directly or indirectly" means conduct taken individually, through other individuals, or as a partner, shareholder, member, officer, director, manager, employee, salesperson, independent contractor, agent, or consultant for any other individual or entity.

7. <u>Non-Solicitation/Non-Interference</u>. During the Restricted Period, Employee shall not, either for Employee's own account or for or on behalf of any Competitor, directly or indirectly, take any of the following actions:

   (a) Contact or otherwise solicit any employee, consultant, or independent contractor of the Company with the intention of encouraging such person to terminate his or her employment or other relationship with the Company or any of its Affiliates, or employ or otherwise hire or engage any such person;

   (b) Solicit, call upon, accept work and/or orders for product from, or initiate communication or contact with any Customer for the purpose of offering Competitive Products to such Customer, or otherwise offer Competitive Products to such Customer;

   (c) Solicit, call upon or initiate communication or contact with any Customer, vendor or supplier of the Company or any of its Affiliates for the purpose of encouraging such person to terminate, place elsewhere or reduce the volume of its business with the Company or its Affiliates; or

   (d) Otherwise attempt to directly or indirectly interfere with the Company's or any of its Affiliates business or its relationships with its employees, independent contractors, vendors, suppliers or Customers.

8. <u>Non-Competition</u>. During the Restricted Period, Employee shall not, either for Employee's own account or for or on behalf of any Competitor, directly or indirectly, take any of the following actions:

   (a) (i) Have an ownership or financial interest in a Competitor, (ii) advise or consult with a Competitor concerning competitive activity in the Territory, or (iii) otherwise be employed by or provide services in a Competitive Capacity to a Competitor in the Territory;

   (b) Engage in the production, sale or distribution of Competitive Products in the Territory; or

   (c) Market, sell, or otherwise offer or provide Competitive Products in the Territory.

Page 5 of 9

Case 2:24-cv-04092-BP   Document 3-2   Filed 06/06/24   Page 15 of 19

## GENERAL PROVISIONS

9. <u>Survival/Independent Agreement</u>. Unless expressly set forth in a document signed by both parties, the restrictive covenants set forth herein shall survive the termination of this Agreement and the termination of Employee's employment for any reason, voluntary or involuntary. Employee's obligations hereunder are independent of Employee's employment. Any breach or alleged breach by the Company of any obligation to Employee shall not affect the binding nature of Employee's obligations under this Agreement or excuse or terminate Employee's obligations hereunder.

10. <u>Severability</u>. If any provision of this Agreement is found to be invalid in any jurisdiction, in whole or in part, such provision shall remain valid in all other jurisdictions. If any court determines that any provision of this Agreement is unenforceable because of the duration or scope of such provision, such provision shall not be rendered void, and such court shall have the power to amend the scope or duration of such provision, and in its amended form, such provision shall remain in full force and effect. If any provision of this Agreement is found to be void or unenforceable for any reason, all remaining provisions of this Agreement shall remain in full force and effect.

11. <u>Specific Enforcement/Injunctive Relief</u>. Employee agrees that it would be difficult to measure the Company's and its Affiliates' damages from a breach or threatened breach of this Agreement by Employee, but that such breach or threatened breach could result in damages that would be significant and irreparable. Employee agrees that the Company and its Affiliates shall be entitled, in addition to any other remedies available at law, to seek injunctive or other equitable relief against such breach or threatened breach. If the Company and/or its Affiliates prevail in any action brought to enforce this Agreement, the Company and/or its Affiliates shall be entitled to costs and attorneys' fees incurred by them in such action. Notwithstanding any agreements to arbitrate disputes, the parties agree that a temporary restraining order, temporary injunctive relief, or permanent injunctive relief may be pursued and secured in court to prevent immediate harm without waiving any party's ability to have all issues of final relief and damages made subject to sole and exclusive arbitration procedures.

12. <u>Amendments; Assignments</u>. No modification, amendment, extension or waiver of this Agreement shall be binding unless in writing and signed by the parties. The waiver by the Company of a breach of this Agreement shall not be construed as a waiver of any subsequent breach. Nothing in this Agreement shall be construed as a limitation upon the Company's right to modify or amend any of its manuals or policies in its sole discretion. This Agreement shall inure to the benefit of, and be binding upon the parties and their heirs, administrators, successors and assigns, and may be assigned by the Company to its successors and assigns and Affiliates. Employee may not assign any rights or obligations hereunder without the written consent of the Company.

13. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements between the parties in connection with the subject matter.

14. <u>Acknowledgment.</u> Employee acknowledges that he or she has carefully read and considered the provisions of this Agreement, and having done so, agrees that the restrictions set forth are fair and reasonably required for the protection of the legitimate business interests of the TopBuild Group.

15. <u>Tolling of Restrictive Periods</u>. The time periods specified herein with respect to post-termination restrictive covenants will be tolled in the event of any breach of this Agreement by Employee until either such breach has been fully cured or all legal proceedings with respect thereto have ended,

whichever is later.

16. <u>Benefit; Agreement to Be Disclosed By Employee.</u> This Agreement is expressly intended by the parties to benefit the Company and the other Affiliates forming part of the TopBuild Group, and any assignee or other successor in interest of the Company or its Affiliates. Employee acknowledges and agrees that this Agreement shall be assignable by the Company to any Affiliate or successor to the Company's business or portion of the Company's business for which Employee is employed, and that the Company's Affiliates each shall have the right to enforce this Agreement directly against Employee as if they were parties hereto, as intended third party beneficiaries of this Agreement. Employee agrees to disclose the existence of Employee's obligations hereunder to all third parties who engage or employ or otherwise become associated or have a business relationship with Employee after the date hereof, and hereby irrevocably consents to the Company's or its Affiliates contacting any and all third parties at any time and providing them with a copy of this Agreement to verify compliance with the terms hereof. Employee shall not assert, and hereby releases the Company and its Affiliates from, any claims relating to the Company's or its Affiliates' communications or actions with respect to any third parties pursuant to the foregoing provisions.

17. <u>Notices</u>. All notices in accordance with this Agreement shall be in writing and given by hand-delivery, overnight express delivery, or certified U.S. mail, return-receipt requested, and properly addressed to the party for whom it is intended at the following addresses or such other address as is most recently noticed for such party:

       If to the Company:    at the Company's principal offices located at 475 North Williamson Boulevard, Daytona Beach, FL 32114, Attn: Legal Department

       If to Employee:    at Employee's address as set forth in the records of the Company.

Notices shall be effective as of the date of delivery to the intended recipient party.

18. <u>Employee Release</u>. Employee hereby irrevocably consents to the use of Employee's name, picture, portrait, voice or other likeness in any audio and/or visual work, including but not limited to photographs, audio recordings, video motion pictures, films, etc., which the Company and/or its Affiliates and/or their agents produce in relation to the marketing and advertising of the Company's or its Affiliates' products and/or services, in perpetuity and without the requirement of any further consent, attribution or consideration whatsoever. Employee further hereby grants to the Company and its Affiliates and licensees the right to modify, publish, copy, sublicense, and distribute any of the above works, at the Company's or its Affiliates' or licensees' sole discretion, or any part or remake thereof, in any medium throughout the world in perpetuity.

19. <u>Nondisparagement</u>. Employee agrees not to make any disparaging, defamatory or negative remarks or statements, whether oral or written, to any third party regarding the Company or its Affiliates, or any of their employees, contractors or other representatives or their business, products or services.

20. <u>Miscellaneous.</u> This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Except with respect to any claim by either party against the other party relating to this Agreement and seeking injunctive relief or specific performance, any dispute, controversy or claim arising out of or relating to this Agreement, Employee's employment with the Company, or the breach, termination or validity thereof, including specifically, but without limitation, any and all claims involving the Age Discrimination Act, the Americans with Disabilities Act, Title VII of the Civil Rights Act, the

Occupational Safety and Health Act, the Fair Labor Standards Act, the Family Medical Leave Act, and/or any other claim based on any constitutional, federal, state, regional, county or local law, regulation, ordinance, rule or other basis, shall be asserted and finally settled in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association then in effect, by a single arbitrator appointed by mutual agreement of the parties or in accordance with said Rules if the parties are unable to agree on an arbitrator. The place of arbitration shall be Daytona Beach, Florida, U.S.A. and the parties agree to submit to personal jurisdiction exclusively in such venue for such arbitration and exclusively in the state courts located in or nearest to such venue for any proceeding brought by either party seeking injunctive relief or specific performance. The internal procedural and substantive laws of Florida shall govern this Agreement and all questions of arbitral procedure, arbitral review, scope of arbitral authority, and arbitral enforcement as well as in any other legal proceedings brought by either party involving this Agreement. Employee waives any right to become part of, commence or join in any class action against the Company or any of its Affiliates. The parties agree that, with the exception of claims seeking specific performance or injunctive relief, the decision of the arbitrator shall be the sole and exclusive remedy between them regarding any claims, counterclaims, issues or accountings presented or pled to the arbitrator, that any monetary award shall be made and shall be promptly payable in U.S. dollars without deduction or offset. Arbitration fees and costs shall be payable by the Company, except that any costs, fees or taxes incurred in enforcing a decision against the Employee shall, to the maximum extent permitted by law, be charged against the Employee. Monetary awards shall include interest accruing from the date of damages incurred for breach or other violation of this Agreement, and from the date of the award until paid in full, at a rate to be fixed by the arbitrator. The prevailing party in any court proceeding relating to this Agreement shall be entitled to payment of its attorney's fees and costs by the nonprevailing party.

21. <u>No Guarantee of Employment; Representation Regarding Prior Employment</u>. Nothing in this Agreement shall be interpreted or construed to be a guarantee of ongoing employment, or to otherwise limit the Company's right to terminate Employee's employment at any time. Employee represents and warrants that he or she is not subject to any agreement or other obligation of any kind that would prohibit or restrict his or her employment by the Company, and acknowledges that the foregoing representation is a material inducement for the Company to hire and/or retain Employee.

22. <u>Notice of Immunity under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA")</u>. Employee shall not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that: (i) is made: (A) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. If Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Employee may disclose the Company's trade secrets to Employee's attorney and use the trade secret information in the court proceeding if Employee: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

IN WITNESS WHEREOF, the parties have signed this Agreement effective as of the day and year first above written.

**EMPLOYEE**

Signed: _____

Printed: Lonnie Dillon

Dated: 4-19-2024

**THE COMPANY**

By: _____ Brian Kazzier

Title: Direct of operational _____

Dated: 4/19/24